UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARMANDO VIVEIROS,                    *
                                     *
        Plaintiff,                   *
                                     *
        v.                           *
                                     *        Civil Action No. 1:15-cv-13100-ADB
NANCY A. BERRYHILL,[1]               *
                                     *
        Defendant.                   *
                                     *

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

        On August 17, 2010, Plaintiff Armando Viveiros ("Mr. Viveiros" or "Claimant") brought

an action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging

the final decision of the Commissioner of the Social Security Administration (the

"Commissioner"), which denied his claim for Social Security Disability Insurance ("SSDI"). See

Viveiros v. Astrue, No. 10-cv-11405-JGD (D. Mass. Aug. 17, 2010), ECF No. 1. On February

23, 2012, Magistrate Judge Judith G. Dein remanded the case for further proceedings. See

Viveiros v. Astrue, No. 10-11405-JGD, 2012 WL 603578 (D. Mass. Feb. 23, 2012). Thereafter,

the Commissioner denied Claimant's SSDI claim and Claimant filed this action on August 6,

2015. [ECF No. 1]. Currently pending before the Court are Claimant's motion to reverse the

Commissioner's decision denying his disability benefits [ECF No. 22], and the Commissioner's

---

[1] "Nancy A. Berryhill is the Deputy Commissioner of the Social Security Administration, and
she leads the Administration until a new Commissioner is nominated and appointed. Therefore,
pursuant to Federal Rule of Civil Procedure 25(d), Berryhill is automatically substituted as the
defendant in this action." Santos v. Berryhill, No. 16-11707-GAO, 2018 WL 1532615, at *4 (D.
Mass. Mar. 29, 2018).

cross-motion for an order affirming the decision. [ECF No. 27]. For the reasons described herein, the Court finds that the Administrative Law Judge's ("ALJ") decision was supported by substantial evidence and therefore <u>DENIES</u> Claimant's motion to reverse and remand and <u>ALLOWS</u> the Commissioner's motion to affirm.

## I.     BACKGROUND

### A.     Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a (1998)).

The Social Security Act (the "Act") provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); <u>see also</u> 42 U.S.C. § 423(d)(1)(A). The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. <u>See</u> 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged

in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

## B.     Factual Background

Claimant was born on June 4, 1968. [R. 38].[2] He is married with two adolescent children and has a high school education. [R. 38]. Between 1990 and December 2002, Claimant worked as a delivery person, weaving machine operator, truck driver, and school bus driver. [R. 39−41, 130].

On December 2, 2002, Claimant injured his back when he slipped and fell on ice and has not worked since that time. [R. 41, 275]. Claimant filed his application for SSDI benefits on February 28, 2008. [R. 100–06]. He alleged that he became disabled on December 2, 2002. [R. 41, 275, 1006]. His date last insured was December 31, 2005. [R. 1006]. He claims that he is disabled and unable to work due to severe and persistent back and leg pain, and due to depression and anxiety that he began experiencing as a result of the slip and fall incident. [R. 129, 178].

---

[2] This Court cites references to pages in the Administrative Record, which the parties filed in hard copy and under seal, as "[R. ___]."

### C. Medical Evidence

1. Physical Impairments

On December 3, 2002, Claimant visited Charlton Memorial Hospital after he slipped and fell on ice and injured his neck and back. [R. 360–61]. Following the accident, Claimant experienced neck and back vertebral point tenderness and pain when moving his neck, but had normal sensation and motor function, normal range of motion in his extremities, and no hip tenderness. [R. 360−61]. On December 12, 2002, James Coleman, M.D. reviewed Claimant's spinal X-rays and performed a physical examination; he diagnosed Claimant with lumbar strain, preexisting L5 spondylolysis, cervical strain, and preexisting cervical degenerative disc disease. [R. 348]. During the physical examination, Dr. Coleman also observed good mobility of the cervical spine, no particular point tenderness, hypoactive reflexes of the upper extremities, intact motor power, and a slight restriction of motion of the lumbar spine. [R. 348]. Dr. Coleman opined that Claimant was, at that time, only capable of performing sedentary work. [R. 349]. On January 2, 2003, Dr. Coleman similarly noted that Claimant was only capable of performing "modified" work, but that none was available at his place of employment. [R. 347]. By January 16, 2003, Claimant's neck pain had greatly improved, but his back pain remained consistent and he had begun experiencing thigh pain. [R. 344–45]. He also demonstrated, on that date, good mobility of the cervical spine, slight restriction of complete flexion of the lumbar spine, intact gross motor power, and no sensory deficit. Id.

On March 4, 2003, Claimant's primary care physician, Martin Miner, M.D., reported that Claimant complained of radicular lower back pain and cervical pain. [R. 913]. He noted that a MRI performed on February 5, 2003 showed L4-5 central and right paracentral disc herniation with impingement on the L5 nerve root and spondylolisthesis. [R. 327−28, 913]. Dr. Miner also

recognized that Claimant was employed as the "head of the street crew for the City of Fall River," and that there was "no light duty" option at his job, as Claimant had to "do sanitation and cannot throw light barrels." [R. 913]. Dr. Miner referred Claimant to Alvin Marcovici, M.D. in the neurosurgery department. [R. 913−14].

On March 6, 2003, Claimant saw Dr. Coleman and described feeling pain in his lower back with some radiation in the right leg. [R. 338]. Dr. Coleman observed only a slight restriction of motion in the cervical spine, no particular point tenderness, hypoactive reflexes, excellent motor power, and no sensory deficit. Id. Dr. Coleman again advised that Claimant could perform "only modified work." Id.

On March 10, 2003, orthopedic surgeon Dr. DeWitt Brown, M.D. examined Claimant who was experiencing "ongoing discomfort involving his head, left side, headaches and cephalgia with some low back discomfort." [R. 539]. Dr. Brown's physical examination showed that Claimant had no pain in his pelvic and shoulder rotation, some lower cervical discomfort, no vertebral, paravertebral, pelvic, or sciatic notch tenderness, and no muscle spasm. Id. Dr. Brown concluded that Claimant was capable of returning to his pre-injury duties. [R. 540].

On March 18, 2003, Claimant saw Douglas Johnson, M.D. for residual pain in several areas. [R. 337]. Dr. Johnson observed that Claimant moved reasonably well with some guarding, but had no obvious neurologic deficits and intact reflexes, motor strength, and sensation. [R. 336−37]. Dr. Johnson remarked that he was "hopeful that eventually . . . [Claimant] [will be] back to full duty, full time work." [R. 337]. According to Dr. Johnson, Claimant also agreed that he would be a good candidate for the spine rehabilitation program through which he would attempt to improve his flexibility, endurance, strength, and range of motion. Id.

On April 1, 2003, Dr. Marcovici saw Claimant and reported that he had acute onset of severe back pain radiating down both lower extremities. [R. 984]. Physical examination revealed no neck tenderness, motor strength of five out of five in his upper and lower extremities, intact sensation, and normal motor function. Id. Noting that Claimant had not experienced significant improvement with physical therapy, Dr. Marcovici diagnosed Claimant with degenerative disc disease at L4-5 and L5-S1 with a small anterolisthesis at L5-S1, and gave him a referral for epidural steroid injections. [R. 985].

On May 8, 2003, Claimant reported to Dr. Johnson that he was improving but still had significant back pain. [R. 333]. Dr. Johnson determined that Claimant would have difficulty performing full-duty work, and that he should restrict his lifting to between 11 and 25 pounds. [R. 333−34]. Although Dr. Johnson acknowledged that advancing Claimant back to full-duty work might be difficult, he agreed that Claimant could work a job that did not require as much heavy labor as his previous employment. [R. 333].

On June 16, 2003, Claimant consulted with Christopher Stowe, M.D. regarding his six-month history of back and leg pain. [R. 289]. The physical examination showed that Claimant had five out of five muscle strength, no sensory deficits, good heel and toe raising, moderate flexion and poor extension of the lumbosacral spine, tender lower facet joints, and myofascial tenderness. [R. 290].

On September 30, 2003, Dr. Marcovici examined Claimant and observed that his back was straight with no paraspinal muscle tenderness or spasm, that his motor strength was five out of five, but that he continued to experience disabling back pain and had degenerated L4-5 and L5-S1 discs. [R. 988]. Also, the epidural injections that Claimant received in the past had not significantly improved his condition. Id.

On March 10, 2004, Michael DiTullio, M.D. saw Claimant and opined that he had a small L4-5 disc herniation, as well as aggravation and exaggeration of a pre-existing L5 spondylolysis due to the slip and fall in December 2002. [R. 547]. Dr. DiTullio did not observe any associated cervical nerve root abnormality nor any neck injury. Id. He concluded that Claimant demonstrated a 5% impairment of the whole person based on his symptomatology and that because 15 months had passed since the date of the injury, and Claimant had no objective motor-sensory deficit, Claimant had likely reached a medical end result with a good prognosis for the future. Id. Dr. DiTullio then opined that "it is imperative that [Claimant] permanently avoid those activities which would involve lifting over 30 pounds, prolonged postural fixation, repetitive bending and excessive spinal loading." Id.

On January 18, 2005, Claimant expressed to Dr. Stowe that his pain had remained stable, and Dr. Stowe determined that he was a good candidate for percutaneous disk compression. [R. 287]. On February 17, 2005, Joseph Doerr, M.D. evaluated Claimant and noted a "dull ache" in his back radiating to his legs. [R. 285]. Dr. Doerr reported that he could not determine whether Claimant was permanently disabled and instead suggested that, until receiving further treatment, Claimant restrict himself to minimal bending, lifting, twisting, gripping, awkward neck positions, and extended periods of sitting. [R. 286].

On February 13, 2006, Dr. Miner opined that until February 2005, Claimant could not have performed more than two hours of light duty work per day, and that he had become completely disabled. [R. 293−94]. On February 28, 2006, state agency medical consultant Virginia Byrnes reviewed the evidence of record and determined that Claimant could only occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, stand or walk for two hours in an eight-hour work day, and sit for about six hours in an eight-hour work day.

[R. 297]. On March 6, 2007, a year later, Dr. Brown opined that Claimant had full-time work capacity, and could return to full-time employment, limited only to lifting no more than 30 to 40 pounds. [R. 555].

Beginning in 2009, family physician Jeffrey Syme, M.D. treated Claimant and completed several disability questionnaires and functional assessments between August 2011 and September 2013. [R. 1145−46, 1184−85, 1274−75]. On April 11, 2012, Dr. Syme stated that Claimant "has been disabled on the basis of his back pain for quite some time," that he "has not had any improvement in quite some time," and that he "is certainly not able to sit for long periods of time, to drive for long periods of time, [or] to do any standing for any period of time for more than say 30 minutes." [R. 1145−46]. Dr. Syme further opined that Claimant "is unable to walk more than 100 yards without stopping," and "is unable to do any repeated bending or lifting." [R. 1146]. Dr. Syme declined to opine as to whether Claimant was disabled based on any mental impairment. Id.

On September 25, 2013, Dr. Syme completed a Listing § 1.04A – Spinal Nerve Root Compression questionnaire. [R. 1274−75]. He found Claimant had a spinal disorder (severe lumbar degenerative disc disease), evidence of nerve root compression, neuro-anatomic distribution of pain, limitation of motion of the spine, involvement of the lower back, and positive results from the straight-leg raising test, but also concluded that Claimant exhibited no muscle weakness, no positive signs of motor loss, and no sensory or reflex loss. Id. Dr. Syme noted, however, that although his opinion did not address all of the required findings under the listing, Claimant's combined impairments were medically equivalent to the severity of a Spinal Nerve Root Compression. [R. 1275]. Dr. Syme did not respond to the form's request for an explanation as to how Claimant's impairments were equivalent to the listed impairment. Id.

2.    <u>Mental Impairments</u>

Claimant alleges that he suffered from mental impairments in addition to his lower back and neck injuries. On April 15, 2003, he presented to Dr. Miner with depression, sadness, and dysphoria stemming from his slip and fall in December 2002. [R. 915]. On October 10, 2003, Dr. Miner further assessed that Claimant developed severe depression and sleep disturbance. [R. 920]. On March 29, 2006, consultative examiner Charles Howland, Ph.D. determined that Claimant had several symptoms associated with depression, including suicidal ideation, insomnia, daily depressed and anxious mood, crying spells, thoughts of worthlessness, and lack of motivation. [R. 306]. Dr. Howland also noted that Claimant's personal skills were limited and that he relied on his family to do the basic household chores and to assist him with personal care. [R. 307]. Dr. Howland diagnosed Claimant with dysthymic disorder, borderline intellectual functioning, and a low GAF assessment of 45.[3] [R. 308].

In July 2006, February 2007, and March 2007, Frank Sparadeo, Ph.D., examined Claimant and assessed a score of 38 on the Beck Depression Inventory, consistent with the presence of a major depressive disorder, and a score of 33 on the Beck Anxiety Inventory, consistent with moderate to severe anxiety. [R. 384]. Dr. Sparadeo diagnosed Claimant as having

---

[3] "The Global Assessment of Functioning Scale ranges from 0 ('persistent danger of severely hurting self or others') to 100 ('superior functioning'). A GAF score of 41–50 indicates 'serious symptoms' and 'serious impairment in social, occupational, or school functioning.' Scores of 51–60 and 61–70 reflect moderate symptoms/moderate impairment in functioning and some mild symptoms/some difficulty in functioning, respectively." <u>Rivera ex rel. Z.G.O. v. Astrue</u>, No. CIV. A. 08-11109-GAO, 2009 WL 4063223, at *1 n.3 (D. Mass. Nov. 24, 2009) (quoting <u>Walker v. Barnhart</u>, No. 04–11752–DPW, 2005 WL 2323169, at *4 n.3 (D. Mass. Aug. 23, 2005).

a pain disorder with psychological factors and major depression with co-occurring anxiety. [R. 385].

### D. Hearing Testimony

On December 3, 2009, Claimant testified at a hearing before ALJ Barry Best. [R. 28]. He stated that his knee drops out when he walks, he sometimes falls, he experiences lower back pain extending into his right leg down to his ankle, and his arms go numb. [R. 44]. Claimant described spending a significant amount of time on the couch and said that he never performs housework because it hurts his arms. [R. 48]. He claimed that he is severely depressed, anxious, and nervous, and that he does not like to be around people. [R. 52]. He further assessed that he could only lift 10 to 20 pounds after the accident, and could not frequently lift more than one pound. [R. 49–50]. He stated he could stand for up to 15 minutes at a time and could sit for up to 20 minutes at a time. [R. 50].

Vocational expert ("VE") Ruth Baruke also testified at the hearing. [R. 54]. The VE testified that Claimant's limitations would preclude his past work and preclude transferability of acquired work skills, but that there were jobs existing in significant numbers in the national and regional economy that Claimant could perform, including surveillance system operator, table worker, and order clerk. [R. 57–59].

## II. PROCEDURAL BACKGROUND

Claimant filed his application for SSDI benefits on March 18, 2008 [R. 100–06]. The Social Security Administration (the "SSA") denied the application on May 20, 2008, and denied it again upon reconsideration on September 9, 2008. [R. 63–64, 70–72]. Thereafter, Claimant requested an administrative hearing [R. 73–81], which took place before ALJ Best on December 3, 2009. [R. 26]. Claimant appeared and testified at the hearing without counsel. Id.

On January 26, 2010, the ALJ issued a decision finding that Claimant was not disabled. [R. 4–18]. At step one, the ALJ found that Claimant had not engaged in substantial work activity during the period from the alleged onset date through the date last insured. [R. 9]. He next concluded at step two that Claimant suffered from severe impairments, including lumbosacral degenerative disc disease, a pain syndrome, and a depressive disorder. Id. At step three, the ALJ determined that Claimant's impairments, either alone or in combination, did not meet or medically equal any of the listed impairments. [R. 10]. He then held that Claimant could not perform his past relevant work and that he had the residual functional capacity ("RFC") to perform sedentary work, except that he required the option to sit or stand at will, was limited to unskilled work, and required a work break every two hours. [R. 11]. At step five, the ALJ concluded that Claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. [R. 17–18].

On May 3, 2010, the SSA Appeals Council denied Claimant's Request for Review. [R. 1–3]. On August 17, 2010, Claimant filed a timely complaint with this Court, seeking review of the Commissioner's decision pursuant to section 205(g) of the Act. See Viveiros v. Astrue, No. 10-cv-11405-JGD (D. Mass. Aug. 17, 2010), ECF No. 1. Claimant argued on appeal that (1) ALJ's findings regarding his RFC were not supported by substantial evidence because the ALJ did not properly weigh the opinions of his treating physicians, (2) the ALJ's credibility determinations were not supported by substantial evidence, and (3) the ALJ erred by failing to reference Claimant's moderate mental limitations in his hypothetical questions to the vocational expert. See Viveiros, 2012 WL 603578, at *6−12. On February 23, 2012, Magistrate Judge Dein remanded the case for further proceedings due to the impropriety of certain hypotheticals posed to the VE, but rejected Claimant's other arguments, finding no reversible error in the weight

given to the opinions of Dr. Miner, Dr. Marcovici, Dr. Howland, Dr. Sparadeo, and Mr. Douglas Riley, M.S.W. and holding that the ALJ properly assessed Claimant's credibility. See id. at *8, *12–13.

On April 10, 2012, the SSA Appeals Council referred the case to ALJ Best for further administrative proceedings. [R. 1047–50]. A supplemental hearing took place on October 22, 2013 [R. 1295], and the ALJ issued a second decision finding that Claimant was not disabled under sections 216(i) and 223(d) of the Act. [R. 1017]. At step one, the ALJ determined that Claimant had not engaged in substantial gainful activity during the period from his alleged onset date through his date last insured. [R. 1006]. He found at step two that Claimant had the severe impairments of lumbar degenerative disc disease, pain syndrome, and depressive disorder. Id. At step three, the ALJ held that Claimant's physical and mental impairments did not meet or medically equal the severity of the applicable listed impairments under 1.00 (Musculoskeletal System Disorders) or 12.04 (Depressive, Bipolar and Related Disorders). Id. Although the ALJ found Claimant to be unable to perform any past relevant work through the date last insured, he assessed that Claimant had the RFC to perform sedentary work "with the ability to lift/carry up to 10 pounds occasionally and [five] pounds frequently; sit a total of at least [six] hours and stand/walk up to a total of [two] hours during an [eight] hour workday; the ability to alternate sitting and standing up to a few minutes every hour during an [eight] hour workday; and a limitation in [concentration, persistence, and pace] which allows [Claimant] to perform, but limits him to, uncomplicated, routine, repetitive tasks of not more than [] several steps and which do[es] not require [him to] exercise significant independent judgment[.] [Claimant] requires work breaks on average every [two] hours during an [eight] hour workday." [R. 1007−08]. At

step five, the ALJ determined that there were jobs that existed in significant numbers in the national and regional economy that Claimant could perform. [R. 1015].

On June 6, 2015, the SSA Appeals Council found that the ALJ's decision was supported by substantial evidence and was consistent with applicable regulations. [R. 989–92]. Claimant filed a timely complaint with this Court on August 6, 2015, again seeking review of the Commissioner's decision pursuant to section 205(g) of the Act. [ECF No. 1].

## III.    STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (citing 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it. "If additional evidence is to be considered, it must be by way of remand[,]" pursuant to sentence six of Section 205(g). Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and to order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the

Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .”).

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is de novo. Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court "must affirm the [Commissioner's] resolution, *even if the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

IV.    **DISCUSSION**

Claimant essentially renews the following challenges that he raised before Magistrate Judge Dein in appealing the ALJ's initial decision: (1) that the ALJ failed to attribute controlling weight to the opinions of Claimant's treating physicians, (2) that the RFC determination did not

adequately account for the opinions of Claimant's treating physicians, and (3) that the ALJ's credibility determination overemphasized Claimant's sporadic daily activities or was otherwise not supported by substantial evidence. Although the case was originally remanded to revisit a narrow issue concerning the hypotheticals posed to the VE, Claimant now raises no objection to the ALJ's decision based on the questioning of the VE in the supplemental hearing.

A.    Treating Physician Opinions

Claimant argues that the ALJ improperly weighed the opinions of certain treating physicians: Dr. Miner, Dr. Marcovici, and Dr. Syme. "'[C]ontrolling weight will be given to a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Arrington v. Colvin, 216 F. Supp. 3d 217, 239 (D. Mass. 2016), aff'd sub nom. Arrington v. Berryhill, No. 17-1047, 2018 WL 818044 (1st Cir. Feb. 5, 2018) (quoting Bourinot v. Colvin, 95 F. Supp. 3d 161, 175 (D. Mass. 2015) (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2))). "The ALJ is entitled 'to downplay the weight afforded [to] a treating physician's assessment of the nature and severity of an impairment where . . . it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." Id. at 240 (quoting Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004)).

"Regardless of whether . . . the [ALJ] decides to discount the treating physician's opinion, the decision 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record.'" Rodriguez v. Astrue, 694 F. Supp. 2d 36, 42 (D. Mass. 2010) (quoting SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996)). The ALJ considers, among other things, "'the length of the treatment relationship and the

frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole'" in determining the appropriate weight. Arrington, 216 F. Supp. 3d at 240 (quoting Bourinot, 95 F. Supp. 3d at 176); see Santana v. Colvin, No. 15-CV-13232-IT, 2016 WL 7428223, at *3 (D. Mass. Dec. 23, 2016) ("If not 'controlling,' the treating opinion must still be evaluated against six criteria in order to fulfill the mandate that the ALJ 'always give good reasons' when determining the weight a treating opinion deserves." (quoting 20 C.F.R. § 404.1527)). "However, the regulations do not require the ALJ to list these factors or 'to expressly state how each factor was considered,' as long as the ALJ 'provide[s] good reasons for the weight given to a treating source opinion.'" Arrington, 216 F. Supp. 3d at 240 (quoting Bourinot, 95 F. Supp. 3d at 177 (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2))). If the treating source opinion conflicts with other opinions in the record, the ALJ is entitled to resolve those conflicts and "may reject the opinion of the treating physician so long as an explanation is provided and the contrary finding is supported by substantial evidence." Tetreault v. Astrue, 865 F. Supp. 2d 116, 125 (D. Mass. 2012) (internal quotations and citation omitted); Rodriguez v. Astrue, 694 F. Supp. 2d 36, 46 (D. Mass. 2010) ("[I]n most situations, any conflict between a treating physician's opinion and other evidence in the record is to be resolved by the Commissioner." (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981))).

In determining that the ALJ provided a sufficient explanation for not crediting Dr. Miner and Dr. Marcovici's opinions that Claimant was disabled, Magistrate Judge Dein found that "the ALJ expressly relied, among other things, on the opinions of Dr. Coleman and Dr. DiTullio, as well as on the opinions of other treating and examining physicians which undermined

[Claimant's] claim of disability." Viveiros, 2012 WL 603578, at *8. Here, the ALJ's second decision acknowledged Dr. Miner's opinion but noted that it was inconsistent with his earlier records that implied that Claimant could perform light duty at his prior job on the street crew. [R. 1014]. He also noted that Dr. Miner and Dr. Marcovici's opinions conflicted with Dr. Brown's conclusion that Claimant could return to his past work, Dr. Johnson's opinion that Claimant could work if he limited his lifting to 11 to 25 pounds, and Dr. DiTullio's assessment that Claimant could work if he limited his to lifting less than 30 pounds and avoided prolonged postural fixation, repetitive bending, and excessive spinal loading. [R. 1014]. Accordingly, consistent with Magistrate Judge Dein's assessment of the initial ALJ decision, the ALJ also properly evaluated the opinions of Dr. Miner and Dr. Marcovici following the remand and provided sufficient reasons for not giving those opinions controlling weight.

Claimant also suggests that Dr. Syme's opinion should receive controlling weight. Dr. Syme completed disability questionnaires and functional assessments between August 2011 and September 2013 and found that Claimant's lower back pain was disabling, but he provided these opinions more than five years after Claimant was last insured. [R. 1014]. Although "'an ALJ may use evidence from the surrounding time periods to draw conclusions regarding the relevant time period,'" Arrington, 216 F. Supp. 3d at 232 (quoting Resendes v. Astrue, 780 F.Supp.2d 125, 140 (D. Mass. 2011)), the record here contains no evidence that Dr. Syme's opinions rendered over five years after the date last insured applied retrospectively to near the relevant time period between the alleged onset date and the date last insured. The ALJ therefore properly weighed Dr. Syme's opinions, which he wrote in the present tense, as contemporaneous assessments of Claimant's condition. See Whitehead v. Astrue, Civ. A. No. 11-cv-11292, 2012 WL 5921045, at *6 (D. Mass. Nov. 26, 2012) ("The Commissioner correctly points out that the

opinions at issue are worded in the present tense without any retrospective component and thus purport to assess plaintiff's functioning at the time they were rendered."); Pierce v. Astrue, No. 1:10-cv-242-JAW, 2011 WL 2678919, at *5 (D. Me. July 7, 2011), report and recommendation adopted, No. 1:10-cv-00242-JAW, 2011 WL 3270251 (D. Me. July 29, 2011) (construing the medical opinion as pertaining to claimant's condition as of opinion's date, "rather than to his condition prior to his date last insured," because physician "answered questions phrased in the present tense"); Graham v. Barnhart, No. 02-CV-243-PB, 2006 WL 1236837, at *6 (D.N.H. May 9, 2006) (retrospective medical assessment may have probative value but opinion was of "little value" where physician "gave no indication that his evaluation was retrospective, and it apparently reflected [claimant's] condition at the time [the physician] treated her").[4]

Finally, Claimant argues that the ALJ improperly considered the opinions of consultative physicians Dr. Howland and Dr. Sparadeo. Magistrate Judge Dein addressed Claimant's similar arguments raised in his initial appeal as follows:

> [The ALJ] explained that he [gave] limited weight to the opinions of Dr. Howland and Dr. Sparadeo because their evaluations occurred after the date when [Claimant] was last insured, and because their findings were based on [Claimant's] statements, which the ALJ found to be not entirely credible, rather than on their own observations during the relevant time period . . . . The ALJ further explained that he was giving little weight to the GAF score of 45 because there was little if any evidence in the record during the relevant time period to support that level of impairment, and because [Claimant] admitted to using marijuana, which is a depressant . . . .

___

[4] Claimant also vaguely notes that Dr. Syme indicated that Claimant's conditions met the Listing at 1.04A – Spinal Nerve Root Compression, but that the ALJ stated that "no source opined that [Claimant's] physical impairment met or equaled in severity the requirements of any listed impairment particularly before the expiration of insured status." [ECF No. 23 at 10]. As discussed above, the ALJ accurately characterized the source opinions in the record, given that Dr. Syme rendered his opinion on the listed impairment in September 2013, and the record contains no evidence that the opinion was retrospective to the period between the alleged onset date and date last insured.

> In reaching his conclusions regarding [Claimant's] mental limitations, the ALJ also noted that [Claimant] had sought no counseling or psychiatric treatment, and had minimal complaints, prior to his date last insured . . . . Moreover, the ALJ cited to evidence which conflicted with the more dire assessments of Dr. Howland and Dr. Sparadeo. That evidence included emergency room records from 2002 and 2004, which showed that [Claimant] was oriented with a normal mood and affect, . . . as well as an assessment of [Claimant's] mental functional limitations by an agency reviewer, who determined that up through the date last insured, [Claimant] had no more than moderate limitations. . . .
>
> The record demonstrates that the ALJ adequately weighed the opinions of Dr. Howland and Dr. Sparadeo, and provided a sufficient explanation for not crediting those opinions. His decision in that regard is based on substantial evidence.

Viveiros, 2012 WL 603578, at *9. Here, as in the initial ALJ decision before Magistrate Judge Dein, the ALJ adequately explained the reasons that Dr. Howland and Dr. Sparadeo's opinions received limited weight: (1) the emergency room observations reflected that Claimant was oriented with a normal mood and affect; (2) Claimant sought no counseling or psychiatric treatment for his alleged impairments during the relevant time period; (3) Claimant raised minimal complaints about his mental health during the relevant time period; (4) Dr. Howland and Dr. Sparadeo rendered their opinions after the date last insured without any indication that they should apply retrospectively; (5) the physicians based their opinions on the Claimant's statements rather than their observations; and (6) Claimant admitted to using marijuana, which acts as a depressant. [R. 1014−15]. Accordingly, the ALJ provided a sufficient explanation for a subsequent reviewer to follow his reasoning in attributing limited weight to Dr. Howland and Dr. Sparadeo's opinions and therefore the second ALJ decision, like the first, presents no error.[5]

---

[5] Claimant also asserts that the ALJ ignored the opinion of Claimant's therapist, Douglas Riley, M.S.W., who diagnosed Claimant with Dysthymia, General Anxiety Disorder, PTSD, substance abuse, and chronic pain as stressors contributing to Claimant's mental health issues. In addressing this same argument raised as to the initial ALJ decision, Magistrate Judge Dein explained that "[a]lthough it would have been preferable for the ALJ to have addressed Mr. Riley's opinions in his written decision, this court finds that his failure to do so does not warrant a reversal," considering that the opinions of clinical social workers like Mr. Riley are not entitled

**B.      RFC Assessment**

Claimant next argues that the ALJ's RFC assessment is not supported by substantial evidence because it does not fully reflect the opinion evidence in the record, which he claims does not support an RFC for any exertional level of work. [ECF No. 23 at 20-21]. "An RFC assesses what a claimant 'can still do despite [his] limitations.'" Dorow v. Berryhill, No. CV 16-11497-TSH, 2018 WL 1570168, at *2 (D. Mass. Mar. 30, 2018) (quoting 20 C.F.R. §§ 404.1545(a), 416.945(a)). "The claimant has the burden of providing evidence to establish how [his or her] impairments limit [his or her] RFC," id. (citing Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)), and "[i]t is the duty of the ALJ to determine a claimant's RFC based upon the entire record." Id. (citing 20 C.F.R. §§ 404.1545, 404.1546). In evaluating a claimant's RFC, the ALJ may "piece together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 144 (1st Cir. 1987).

Claimant argues that the ALJ failed to incorporate Dr. Syme's opinion that he needs unscheduled breaks every two hours for up to 15 minutes. First, the ALJ explained that Dr. Syme

---

to controlling weight and Mr. Riley did not treat Claimant until more than two years after the date last insured. Viveiros, 2012 WL 603578, at *10. Magistrate Judge Dein also recognized that "to the extent Mr. Riley's assessments of [Claimant] suggest that [he] was disabled from working as a result of his mental limitations, they are inconsistent with [an] agency reviewer's opinion that [Claimant] had only moderate limitations in mental functioning and retained the capacity to work during the relevant time period. . . . Therefore, this court concludes that the ALJ's failure to address Mr. Riley's opinion was at most harmless error." Id. Here, Claimant acknowledges that Mr. Riley rendered the opinion after the date last insured. There is no suggestion in the medical evidence that the opinion was retrospective to the period of time near or before the date last insured. The opinion, rather, describes "stressful items" over the "last 30 days" but does not reference any stressful items from the "last 12 months." [R. 855]. The date last insured preceded the opinion by over two years. Accordingly, the ALJ committed no error by not addressing Mr. Riley's opinion. Further, as Magistrate Judge Dein found, an error, if any, was harmless.

rendered his opinion many years after the date last insured and that the record is devoid of evidence that his opinion addresses the relevant time period between the alleged onset date and the date last insured. The RFC determination is consistent with Dr. Byrnes' RFC evaluation [R. 296−304], Dr. Johnson's assessment that Claimant could work but should attempt to find a job with less heavy labor than his prior work [R. 333−34], Dr. Coleman's notes from December 2002 and January 2003 indicating that Claimant was capable of performing "modified" or "sedentary" work [R. 347, 349], Dr. DiTullio's examination results showing that Claimant had a "5% impairment of the whole person," [R. 547], Dr. DiTullio's advice that Claimant should avoid lifting over 30 pounds, prolonged postural fixation repetitive bending, and excessive spinal loading, id., Dr. Brown's opinion that Claimant "ha[d] a full-time work capacity," and was capable of returning to work if he avoided lifting more than 30 to 40 pounds [R. 549−555], and Dr. Miner's notes from March 2003 stating that there was no "light duty" at Claimant's employment with the street crew for the City of Fall River [R. 913]. Therefore, the ALJ properly weighed Dr. Syme's opinions in reaching a RFC determination that is supported by substantial evidence.

### C.      Credibility Determination

The First Circuit has held that an ALJ must consider certain factors in making a determination about a claimant's subjective complaints about pain or other symptoms. Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). The relevant factors, known as the Avery factors, include: "(1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) Type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) Treatment, other than medication, for relief of pain; (5) Functional restrictions;

and (6) The claimant's daily activities." Id. The ALJ is not required to "expressly discuss every enumerated factor," Balaguer v. Astrue, 880 F. Supp. 2d 258, 268 (D. Mass. 2012), nor is the ALJ required to provide "'an explicit written analysis of each factor.'" Hart v. Colvin, No. 16-cv-10690, 2017 WL 3594258, at *11 (D. Mass. Aug. 21, 2017) (citing Vega v. Astrue, No. 11-cv-10406-WGY, 2012 WL 5989712, at *8 (D. Mass. Mar. 30, 2012)). "[A]s long as an ALJ's credibility determination is supported by substantial evidence, that decision is entitled to deference." Jones v. Colvin, Civ. A. No. 14−12211–ADB, 2016 WL 1270233, at *8 (D. Mass. Mar. 31, 2016) (citing Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)).

Here, the ALJ wrote that "[a]fter careful consideration of the evidence, [he] finds that [Claimant's] medically determinable impairments could reasonably be expected to cause some symptoms of the type alleged, but that [Claimant's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." [R. 1013]. Claimant challenges the ALJ's determination on the grounds that the ALJ (1) improperly relied on Claimant's lack of mental health treatment; (2) ignored his anxiety disorder and minimized the significance of his depressive disorder; and (3) gave an inappropriate amount of weight to his daily activities in discrediting Claimant's subjective complaints.

First, as he did before Magistrate Judge Dein, Claimant relies on Mason v. Apfel, 2 F. Supp. 2d 142 (D. Mass. 1998) in arguing that the ALJ improperly relied on Claimant's lack of treatment to evaluate his subjective complaints about his mental health. The Mason court held that the ALJ erroneously assumed that the claimant's mental impairment first became disabling only on the date that she began treatment, even though the claimant had "provided the ALJ with

sufficient medical evidence . . . to infer that she was disabled by her mental illness" prior to treatment. <u>Mason</u>, 2 F. Supp. 2d at 150.

Here, the ALJ did not foreclose the possibility that Claimant's impairments could have been disabling prior to when he began receiving treatment. As Magistrate Judge Dein discussed, and as described above, the ALJ properly considered the lack of mental health treatment as one factor in assessing the credibility of Claimant's subjective complaints. <u>See</u> <u>Viveiros</u>, 2012 WL 603578, at *9 n.5 (concluding that Claimant having not received mental health treatment during relevant period alone was not enough to support ALJ's conclusion that he had sufficient mental capacity to maintain employment, but finding that ALJ "relied on evidence from the record which undermined [Claimant's] claim of a disabling mental condition during the relevant time period" and not "solely on [Claimant's] failure to obtain treatment"); <u>see also</u> <u>Squeglia v. Berryhill</u>, Civ. No. 16-cv-238-JD, 2017 WL 773528, at *6 n.5 (D.N.H. Feb. 28, 2017) ("[A] lack of sustained treatment for a claimed impairment may be evidence that the claimant is not disabled."); <u>Baxter v. Colvin</u>, No. 2:13-cv-344-GZS, 2014 WL 5326238, at *3 (D. Me. Oct. 20, 2014) ("[The ALJ] reasonably considered the plaintiff's relatively sparse treatment inconsistent with his allegations of disabling pain."); <u>Nolan v. Astrue</u>, Civ. No. 09-323-P-H, 2010 WL 2605699, at *7 (D. Me. June 24, 2010) (ALJ's credibility assessment permissibly considered "contemporaneous medical records revealing little or no treatment prior to [claimant's] date last insured for her alleged disabling conditions"); <u>cf.</u> <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 770 (1st Cir. 1991) ("The lack of any evidence of sustained treatment in this case only bolsters our decision that the record adequately supports the Secretary's final

conclusion that claimant was not disabled.").[6] Thus, the ALJ did not err in considering Claimant's lack of treatment as a component of the credibility determination.

Second, Claimant asserts that the ALJ ignored his anxiety disorder and minimized his depressive disorder. The ALJ's decision, however, expressly states that Claimant had severe impairments, including depressive disorder. [R. 1006]. The ALJ acknowledged Dr. Miner's assessment that Claimant had situational depression and had developed severe depression by October 2003, as well as Claimant's reports to Dr. Howland and Dr. Sparadeo of sleep disturbance, anxiety, occasional suicidal ideation, and depression, among other mental symptoms. [R. 1012−13]. The ALJ further noted that Dr. Sparadeo assessed Claimant with major depressive disorder with co-occurring anxiety, but as discussed above, provided ample reasons for giving limited weight to the opinions of Dr. Howland and Dr. Sparadeo. [R. 1013−14]. The ALJ therefore adequately considered Claimant's depression and anxiety in reaching a credibility determination.

Finally, Claimant argues that the ALJ improperly relied on his sporadic activities to find that he was capable of working. A claimant's "'sporadic and transitory activities'" may support the finding of an inability, rather than an ability, to engage in substantial gainful activity. Waters v. Bowen, 709 F. Supp. 278, 284 (D. Mass. 1989) (quoting Willem v. Richardson, 490 F.2d 1247, 1249 n. 4 (8th Cir. 1974) (quoting Wilson v. Richardson, 455 F.2d 304, 307 (4th Cir. 1972))); see Dedis v. Chater, 956 F. Supp. 45, 54 (D. Mass. 1997) (finding "a claimant's ability

---

[6] Claimant does not argue that he presented any explanation for the failure to seek medical treatment that the ALJ ignored. Compare Souza v. Barnhart, No. 03-73-P-C, 2003 WL 22961213, at *4 (D. Me. Dec. 15, 2003) ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." (quoting SSR 96−7p, at 140)).

to participate in limited household chores, in and of itself, does not prove he has the ability to perform substantial gainful activity"). There is a "difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week." Ormon v. Astrue, 497 F. App'x 81, 87 (1st Cir. 2012) (citation omitted). On the other hand, "[e]xamining the claimant's daily activities helps to shed light on the veracity of the claimant's claims of pain and illuminate an RFC determination." Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309 (D. Mass. 1998) (finding "the purpose of the RFC is to determine the effects of the claimant's impairment on her ability to perform work, including any limitations on that ability resulting from pain"); see Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (holding a hearing officer may use the testimony of a claimant's daily activities as one factor in assessing credibility despite her family's assistance in completing household work and her frequent breaks); Tavares v. Astrue, No. CIV.A. 11-10153-DPW, 2012 WL 669956, at *13 (D. Mass. Feb. 28, 2012) ("Though [claimant's] daily activities do not, themselves, show an ability to work, they do support an ALJ's adverse credibility finding."); Bailey v. Berryhill, No. 2:17-cv-00080-DBH, 2017 WL 6590546, at *8 (D. Me. Dec. 26, 2017), report and recommendation adopted, No. 2:17-CV-80-DBH, 2018 WL 832841 (D. Me. Feb. 12, 2018) ("While a claimant's activities of daily living, standing alone, do not constitute substantial evidence of a capacity to undertake full-time remunerative employment, an [ALJ] properly may take such activities into consideration in assessing the credibility of a claimant's allegations and in resolving conflicts in the evidence with respect to medical experts' and treating providers' opinions of a claimant's capabilities." (citations omitted)).

Here, the ALJ noted that Claimant lived with his wife and two children, attended Massachusetts Rehabilitation services, did laundry with others carrying the basket, shopped and

drove occasionally, read the newspaper, performed self-care, attended appointments, socialized with friends and family, and cared for his children. [R. 1007, 1013−14]. These activities alone did not form the basis of the ALJ's credibility determination, however. The ALJ addressed the Avery factors and acknowledged Claimant's reports of persistent back pain, lower extremities pain, depression, anxiety, and sleeplessness following his slip and fall, and his testimony that he could lift/carry one pound, stand for 15 minutes, and sit for 20 minutes at a time. [R. 1008−12, 1014]. As to the effectiveness of pain medication and other treatment, the ALJ referenced Claimant's reports on the efficacy of physical therapy, chiropractic therapy, epidural steroid injections, cervical trigger point injections, as well as OxyContin, Doxepin, and other medications to treat his depression. [R. 1010−1013]. The ALJ further discussed Claimant's functional restrictions, particularly the limitations on his ability to lift and his reported memory problems, irritability, pessimism, and occasional suicidal ideation. [R. 1011−13]. On the other hand, the ALJ took into account that Claimant's "examinations generally revealed good cervical mobility with no particular point tenderness, a slight restriction of lumbar motion, intact sensation and motor, an ability to walk on toes/heels, no pain on pelvic or shoulder rotation, no atrophy, within normal straight leg raising, and good shoulder, elbow, wrist, and hand motion." [R. 1014]. He further noted that "imaging studies demonstrated findings that would result in some symptoms but not the severity alleged," that Claimant sought no counseling or mental health treatment before the date last insured, and that several mental health assessments were rendered after the date last insured without any suggestion that they were intended to apply retrospectively. Id. Therefore, the ALJ's credibility determination did not rely solely or even predominantly on Claimant's daily or sporadic activities, and the ALJ properly accounted for them as one component in his comprehensive analysis of the Avery factors. Reyes v. Berryhill,

No. CV 16-10466-DJC, 2017 WL 3186637, at *12 (D. Mass. July 26, 2017) (appropriate RFC assessment where "the ALJ did not rely solely on anecdotal evidence of [claimant's] activities to make his RFC finding," but "discussed [claimant's] daily activities to illustrate inconsistencies in the medical record and then further evaluated the medical opinions and nonmedical evidence to determine [claimant's] RFC").

## V.    CONCLUSION

For the reasons stated herein, the Court finds that the ALJ's decision was supported by substantial evidence and therefore <u>DENIES</u> Claimant's motion to reverse and remand [ECF No. 22] and <u>ALLOWS</u> the Commissioner's motion to affirm [ECF No. 27].

**SO ORDERED.**

June 20, 2018                                                          /s/ Allison D. Burroughs
                                                                       ALLISON D. BURROUGHS
                                                                       U.S. DISTRICT JUDGE